FILED & ENTERED

SEP 28 2022

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY fisherl    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>Lev Investments, LLC<br><br>                    Debtor(s). | Case No.: 1:20-bk-11006-VK<br><br>CHAPTER 11<br><br>**MEMORANDUM OF DECISION SUSTAINING THE OBJECTION TO CLAIM #5**<br><br>Date:        August 26, 2022<br>Time:       9:00 AM<br>Courtroom: 302 |

  There are only a few unclear factual issues concerning claim #5.[1] However, one thing is very clear: $119,000 of Kevin Moda's money was transferred from Gina Lisitsa's personal bank account into her client trust fund account, was removed from that account, and was never refunded to Kevin Moda. The question before the court is "what happened to the money?"

  Through a series of motions for summary judgment and the findings of fact thereon, the court has resolved most of the questions. These will not be repeated here

---

[1] Claim #5 is partially owned by the Law Offices of Donald Reid, who serves as attorney for FR LLC. For ease, the Court only refers to Kevin Moda as the claimholder.

-1-

but are contained in detail in the Order Granting Summary Adjudication of Certain Issues as to the Objection to Claim #5, which is on the court's docket as number 638.

In summary, Dmitri (as manager of Lev), Michael, and Ruvin entered into a Debt Purchase Agreement (DPA) on 12/27/18 which called for Lev to pay a total of $1,022,500 toward the purchase of the Albers note, while Ruvin and Michael would jointly pay $1,257,675.[2] Michael and Ruvin deposited their required contribution in Gina's client trust account, but Dmitri only put in $600,000.  Gina obtained $300,000 from Mariya Ayzenberg (which Ayzenberg sent directly to escrow).  This left the Lev side of the bargain short by $122,500.  Although in the end the additional money was not needed, in an abundance of caution on 12/28/18 Gina transferred $119,000 of the $125,000 that she was holding in her personal bank account to her client trust account. This money was attributable to Moda and was to make up the $122,000 that was missing from the Lev side of the Debt Purchase Agreement. [Transcript, dkt. 654, p. 106-113]

On December 28, 2018, Lisitsa had a total of $1,857,675 in her client trust account from the funds of Lev, Ruvin, and Michael, which were earmarked for the purchase of the Albers note from Evergreen.[3]  On December 28, 2018 Gina transferred $1,741,000 into escrow for the purchase of the note concerning the Albers property. Another $300,000 was sent directly to escrow by Mariya Ayzenberg.  The total amount in escrow was $2,041,000, which was more than sufficient to pay for the purchase of the Evergreen note, leaving $497,547.05 in the trust account, $260,000 of which came from Michael Masinovsky.

There are two ways to look at the situation:

---

[2] Dmitri acted on behalf of Lev, but it is often necessary to specify that he was the actor although legally it was Lev that entered into the DPA, etc.  This memorandum often uses "Dmitri" and "Lev" interchangeably without any intent to make legal findings.

[3] As noted in previous orders, the Court uses first names for many of the people due to the difficulty of pronunciation.  However, when the person is identified as "Michael," that refers to Michael Leizerovitz.  Michael Masinovsky is identified with his full name.

(1) The only money used for the actual purchase of the note came from Lev, Ruvin, Michael, and Ayzenberg. None of Moda's money was attributed to this and at the close of escrow it remained in Gina's client trust account OR

(2) Gina had earmarked Moda's $119,000 for the note purchase and therefore he is a prorate party to the DPA as part of the Lev group of Dmitri, Ayzenberg, and Moda.

SCENARIO #1: The Money Never Left the Client Trust Account

Even before escrow closed, Gina had retained in her client trust account $116,675 of the earmarked money from Dmitri, Ruvin and Michael.[4]  On January 8, 2019, after escrow closed, escrow refunded $1,872.05 as an overpayment and this was put into Gina's client trust account, bringing to $118,547.05 the total earmarked money remaining in the account. From this, Gina did or would reimburse herself or use money for insurance, wire transfers, and her attorney fees in the total amount of $26,696.38. On the date of distribution to Ruvin and Michael, Gina's trust account held $91,850.67 of the earmarked money[5] and an additional $118,547.05 of unearmarked money, exclusive of the $260,000 belonging to Michael Masinovsky, which had or would be returned to him.

Thus, Gina had only $91,850.67 available from earmarked funds to distribute. However, on February 1, 2019, Gina issued two "refund" checks, each in the amount of about $105,480, for the benefit of Ruvin and of Michael.[6]  Together they totaled $210,960.67. Since only $91,850.67 remained in the client trust account from the earmarked money for the purchase, another $119,110 was paid from the other funds

---

[4] The term "earmarked money" is used to mean the money contributed by Ruvin and Michael under the DPA as well as the $600,000 from Lev that was deposited in the Client trust account. Although Moda's $119,000 was available for the purchase of the note, it is not included in the term "earmarked money."

[5] Gina actually refunded Michael and Ruvin a few days before she withdrew money for her fees, but the $15,492.86 of her fees was a debt owed from the earmarked funds.

[6] The parties dispute whether these were indeed refunds, but Gina's email of January 18, 2019 labels them as refunds. 20-11006, dkt. 614-14.

remaining in the client trust account. And this shortfall was made up almost exclusively from the $119,000 that was owned by Moda.

Based upon the findings of the Court as previously set forth in the Amended Order Granting Summary Adjudication of Certain Issues as to the Objection to Claim #5 (dkt, 602) and the Order Granting Summary Adjudication of Certain Issues as to the Objection to Claims #5 (dkt. 638), the following is a chart of the relevant monies in and out of the Lisitsa Client Trust Account:

| MONEY IN LISITSA CLIENT TRUST ACCOUNT | | | | MONEY IN ESCROW ACCOUNT | | |
|---|---|---|---|---|---|---|
| 12/26/18 | Michael Masinovsky | $260,000.00 | | | | |
| 12/26/18 | Ruvin Feygenberg | $125,000.00 | For note purchase | | | |
| 12/27/18 | Dmitri Ludkovski | $600,000.00 | For note purchase | | | |
| 12/28/18 | Michael Leizerovitz | $566,377.50 | For note purchase | 12/28/18 | $3,000.00 | From Gina |
| 12/28/18 | Ruvin Feygenberg | $566,377.50 | For note purchase | 12/28/18 | $1,738,000.00 | From Gina |
| 12/28/18 | Kevin Moda | $119,000.00 | From Gina's personal account | 12/28/18 | $300,000.00 | From Mariya Ayzenberg |
| 12/28/18 | Wire Transfer fees | ($110) | | | | |
| 12/28/18 | Gina sends to escrow | ($3,000.00) | | | | |
| 12/28/18 | Gina sends to escrow | ($1,738,000.00) | | | | |
| 12/28/18 | Gina sends to escrow | ($300,000.00) | | | | |
| | | | | 12/31/18 | ($2,039,127.95) | Escrow closes and this is the total amount paid for the note including fees |
| 1/8/19 | Overpayment received from escrow | $1,872.05 | | 1/8/19 | ($1,872.05) | Overpayment returned to Lisitsa Trust Account |
| 1/8/19 | Wire Transfer fees | ($110) | | | | |
| 1/15/19 | Sent to Michael | ($249,425.00) | The balance | | | |

-4-

| MONEY IN LISITSA CLIENT TRUST ACCOUNT | | | | MONEY IN ESCROW ACCOUNT | | |
|---|---|---|---|---|---|---|
| | Masinovsky | | of the $260,000 was to be controlled by Dmitri | | | |
| 1/24/19 | For Insurance | ($10,983.52) | | | | |
| 2/1/19 | Gina issues check to Alexander Usmanov as a refund to Ruvin | ($105,480.33) | | | | |
| 2/1/19 | Gina issues check to Josef Mamalizer as a refund to Michael | ($105,480.33) | | | | |
| 2/4/19 | Gina pays her law firm for fees | ($15,492.86) | | | | |

    Kevin Moda has not been willing to accept this accounting as to his $119,000. Over time he has made several different claims in an attempt to show that his $119,000 was necessary for or actually used to purchase the note and therefore he has a claim against Lev Investments for that amount. Although Moda has tried to show that there was an agreement with Dimitri on behalf of Lev Investments that Moda would be a participant in the ownership of the Albers property, there is no admissible evidence to prove this. The alleged promissory note contained a forged signature of Dimitri, which was done through a "cut and paste" process. Dmitry disavows the note. Moda said that he obtained it from Gina and there is some evidence that Gina stated that she saw Kevin sign the note. But the experts agree that the signature on the alleged note was not created for that document.

    Another issue raised by Moda was whether Michael Masinovsky's money was used to fund the purchase of the note. This is a "red herring." Gina had been holding $260,000 of Michael Masinovsky's money, but on January 15, 2019 she returned all but $10,575 to him.

Yet another issue concerns why Ruvin and Michael paid a greater amount than Dmitri under the DPA. The explanation is not important or relevant to Moda's claim, though it may explain why the only refunds from the client trust account were to Ruvin and Michael and not to Dmitri.[7]

None of these arguments are relevant and under scenario #1, Moda has no claim in this estate, though he may have one against Gina, Ruvin, and Michael  As to Gina, it might be for breach of fiduciary duty and conversion in that she transferred client money from her client trust account to third parties without the consent or even knowledge of her client - namely Kevin Moda. As to Ruvin and his assignee and Michael and his assignee it would be to recover the excess money that they received. The maximum that they were entitled to as a refund was a total of $91,850.67, which was the money that was remaining in the client trust account from that earmarked for the Albers purchase. Instead, they received an additional $119,110, of which $119,000 belongs to Kevin Moda.

SCENARIO #2: Some Part of Moda's Money was Transferred into the Escrow

One of Moda's arguments is that Dmitri/Lev did not have enough money to pay its half and that is why Ayzenberg contributed her $300,000.  This is correct.  Once Moda allowed attorney-client privilege to be waived, Gina testified that she was holding $125,000 of Moda's money in her personal account and that she transferred  $119,000 of this sum to her client trust account to partially make up the $122,000 that was missing from the Lev side of the Debt Purchase Agreement. [Transcript, dkt. 654, p. 106-113]

Although there is no written agreement, the only evidence is that Gina transferred Moda's money to make sure that there was enough money to close the purchase of the note and to balance out the required contribution for the Lev side of the DPA.  Thus the

---

[7] The Court has not been asked to determine why all excess funds went to Ruvin and Michael rather than be apportioned to Lev and Ayzenberg, but it does support the theory that Moda's money was not included in the calculation of Lev's required contribution.  Lev was allowed to proceed even though it put in less than it should have.

intent was that it would be available, if needed, to close the escrow, but only if the total from Dmitri, Ruvin, Michael, and Ayzenberg was not sufficient. The fact that Dmitri put in less than his required amount and thus breached the DPA would only be known to Ruvin and Michael after the escrow closed and an accounting was created.

Unlike Gina's personal account, this was a client trust account and although the money is all in one bank account, separate records are kept, separate ownership is recognized, and the monies are not actually commingled. In this case there was money received into the account that was earmarked specifically for the purpose of purchasing the Albers property. There was also Moda's money that was to be used as a backup, if needed. Although money is fungible and there is no way to trace each dollar from Gina's account into the escrow, when there are dedicated funds, these must be considered transferred before any other monies are distributed. On December 28, 2018 when Gina transferred money from her client trust account to escrow, she had $1,857,675 in her trust account from Lev, Ruvin, and Michael which was specifically to be used for this purpose. No part of Moda's money was needed to complete this transaction.

Although the court wishes that this dispute could have been resolved quickly and inexpensively, that was not to be. Partially this was because Gina acted as the attorney for the purchasers of the note and she also may have been a beneficiary of Ayzenberg. At the same time she was Kevin Moda's attorney, which was independent of the Albers purchase. And there were adversary proceedings by the Debtor against Gina and against Ruvin and Michael and their company. All of this has made resolving claim #5 much more complex than needed. The reorganized debtor sued Gina, Ruvin, and Michael and reached an undisclosed settlement with them. Kevin Moda may have his own claims against those three parties as noted above.

One further observation: beyond the personalities involved and the belief by Mr. Moda that Lev and Dimitri took advantage of him, the fact that everyone else appears to

be Russian-speaking may have raised an additional issue of cultural clash. Again, this is both unfortunate and expensive. But what has happened has happened.

## CONCLUSION

The Court finds that there was no agreement between Moda and Dmitri/Lev for Moda to be part of this purchase. It appears that Gina, in an attempt to make the transaction work, deposited Moda's money in her client trust account. This may have been with or without Moda's knowledge and/or consent. It was certainly without Dmitri's consent. All Dmitri knew was that Gina was going to find and make up the shortfall of Lev's side of the DPA. Because there was sufficient money without diving into the additional funds that Gina deposited from her personal checking account, those monies were not used for the purchase of the note that allowed the foreclosure on the Albers property. Why Gina did not refund the $119,000 to Moda after the escrow closed, rather than giving it to Ruvin and Michael, is unknown. But she overpaid Ruvin and Michael to the detriment of Moda.

The Court also does not know why Moda has failed to act to recover the money from Ruvin and Michael or perhaps from Gina's malpractice carrier. Maybe there was a state court action; maybe not. Moda clearly has a claim for $119,000, but not against the Debtor.

The objection to claim #5 is sustained.

###

Date: September 28, 2022

Geraldine Mund
United States Bankruptcy Judge